Argued September 13, 1977, reargued September 11, 1978, in banc,
affirmed July 31, 1979

## TROUTMAN, *Appellant,*
## *v.*
## ERLANDSON, *Respondent.*

### (TC 94099, SC 25129)

598 P2d 1211

Gerald R. Pullen, Portland, argued the cause and filed briefs for appellant.

Ralf H. Erlandson, Milwaukie, argued the cause and filed briefs pro se for respondent.

LENT, J.

**LENT, J.**

This is an action at law (Clackamas County Circuit Court Case No. 94099, hereinafter called the "second case") filed October 24, 1975, for damages for alleged common law fraud. The trial court held for defendant upon a plea of res judicata. We affirm the judgment.

Before proceeding to the merits we take the rather unusual step of discussing the procedural path of this case in this court to make understandable to the litigants and the bench and bar the lapse of time between original oral argument herein and decision. The cause was first argued on September 13, 1977, before a department of this court consisting of three regular members and one justice pro tempore. Because of some uncertainties described later in this opinion, we ordered reargument, which took place on September 11, 1978. While the cause was still under consideration but in the final stages of the decision making process, defendant-respondent filed a motion on April 18, 1979, to dismiss the appeal on the ground that although plaintiff-appellant had designated all testimony to be included in the record on appeal, the transcript of proceedings filed in this court did not include the testimony of plaintiff taken on the first day of trial. (Neither party had relied upon the content of that testimony in briefing and twice arguing the cause in this court.) The motion to dismiss was denied on May 22, 1979, but the court requested affidavits from each party as to whether there was anything in the omitted portion of the record which would be necessary for this court to have in arriving at a decision. Based upon the affidavits thereafter filed and the designation of record, the court then ordered that the appellant complete the record. The transcript was then ordered from the court reporter and was received in this court on July 10, 1979.

Prior to commencement of this second case, a decree had been entered in Clackamas County Circuit Court Case No. 90753 (hereinafter called the "first case"). In

the first case, which was a melange of legal and equitable claims between the parties, there were many allegations of wrongful conduct on the part of the defendant as to failure to perform his promises and undertakings, including claimed misrepresentation.[1] Other than the allegations set forth in the footnote the complaint did not contain other standard allegations of a claim based upon fraud. For example, there were no allegations of scienter and detrimental reliance. That first case, filed February 18, 1975, was a suit by this plaintiff and his wife[2] against this defendant, in

---

[1] In pertinent part the complaint alleged:

"I.

"At all relevant times defendant was an attorney at law, and the relationship between plaintiffs and defendant was commingled and intermingled as attorney-client, joint venturer and partner, and at times a fiduciary relationship of trust and full disclosure existed between the parties.

"* * * * *

"V.

"Thereafter *during December, 1971,* plaintiffs and defendant orally agreed to enter into a business relationship designated by the parties as a joint venture or partnership, although plaintiffs still considered defendant as their attorney for all legal proceedings between them. Under this informal oral agreement, plaintiffs and defendant agreed to pool all their individual assets for business purposes, excluding private residences and defendant's law practice. *To induce plaintiffs to enter this agreement* defendant showed a financial statement to plaintiffs indicating defendant's net worth was about $600,000 plus a net investable income of about $2,000 per month from his law practice. Plaintiffs believe and therefore allege that these representations by defendant are false.

"* * * * *

"XV.

"In addition, many other oral agreements and transactions were entered into between the plaintiffs and defendant, but because of the extremely complicated commingling and intermingling of their affairs, and plaintiffs' reliance upon defendant's legal skills and *representations,* plaintiffs do not have any knowledge of the extent of said agreements or their or the defendant's obligations, duties or liabilities, or the nature and extent of the ownership of property or obligations of plaintiffs. * * *

"* * * * *." (Emphasis added)

[2] No one has contended that the absence of the wife as a plaintiff in the second case is of any importance to resolution of the *res judicata* issue; consequently, we shall refer to the husband as plaintiff in both cases.

which the complaint was entitled "Complaint in Equity for Dissolution of Partnership and Accounting." In that first case, however, the trial court found that the parties had already accomplished dissolution by written agreements dated June 21, 1974, and July 18, 1974.[3] The decree, in effect, ordered the parties to carry out the terms agreed upon in those instruments.

In this second case plaintiff alleges:

"I.

"*Commencing* in approximately *June, 1972, defendant* was an attorney at law representing plaintiff in various business matters, and in addition *was a partner with plaintiff* in certain business ventures,

---

[3] The decree provided in part:

*"FINDINGS OF FACT*

"1. Plaintiff Albert Troutman and defendant Ralf Erlandson entered into a joint venture and partnership by agreement of June 22, 1972.

"2. On June 21, 1974, the parties entered into a written agreement identified as Plaintiff's Exhibit 21. It is my opinion and finding that this was an agreement to dissolve the prior partnership between Albert Troutman and defendant. *It establishes and settles the rights and obligations of these parties, arising out of the partnership and otherwise, and includes continuing contractual obligations in the winding up of their affairs and the protection of now separate property rights and interests.*

"* * * * *

"5. It is my general finding that the agreement of June 21, 1974, (Ex.21) was intended to be and was legally effective as a full and complete compromise settlement agreement between the parties of *all prior dealings, agreements and obligations. This includes the partnership or joint venture and all included transactions and also collateral dealings and obligations, including those arising by virtue of a client-attorney relationship.* I further specifically find that all rights of the parties between and against each other are determined by the June 21, 1974, agreement as modified or supplemented by the July 18, 1974, agreement (Ex.23), and any subsequent actions by the dealings between the parties. These agreements provided for specific performance, duties and obligations as declared and set forth hereunder as follows:

"* * * * *" (Emphasis added)

[191]

and a relationship of full trust and confidence existed between the parties. [Emphasis added]

"II.

"At all relevant times plaintiff was the owner of a corporation Ogden Farms Inc., which was the owner of a large farm of 464 acres near Aurora, Oregon, which had valuable mineral deposits and which had a total value including said mineral deposits in excess of $2,000,000.

"III.

"Commencing in June, 1972 and continuing to the present date defendant devised a scheme to defraud plaintiff out of his interest in said farm and obtain an interest of said farm in himself by various false and fraudulent misrepresentations hereinafter set forth, to wit:

"(a) Furnished plaintiff false financial statements showing a net worth between $450,000 to $800,000.

"(b) Furnished false and fraudulent financial statements to creditors of plaintiff, by means of which said creditors discharged other joint obligors of plaintiff who had substantial assets in excess of $140,000 and substituted defendant in their place.

"(c) In representing to plaintiff that if plaintiff conveyed a one-half interest in Ogden Farms to defendant, that defendant had $140,000 available to pay off other persons jointly liable to pay said debts.

"(d) In presenting certain uncollectible investment securities from certain Klamath Indians and representing they had value, with the intent to bolster defendant's credit, and representing the proceeds would be applied to plaintiff's debts.

"(e) In misrepresenting to plaintiff that he would sell all his interest in certain real properties, and contribute all such proceeds to business ventures with plaintiff.

"(f) In misrepresenting to plaintiff that he would provide $2,000 per month from his law practice and

in addition provide all sums in excess of $10,000 defendant would earn from several pending law actions, in a total amount of approximately $120,000.

"(g) In assuring plaintiff that defendant could borrow all necessary money to finance Ogden Farms and meet other business obligations of plaintiff.

"(h) In misrepresenting to plaintiff that he would work on the farm up to 30 hours per week, and his two sons would also work as needed on the farm.

"IV.

"That said false representations were made by defendant intentionally and with knowledge of their falsity, under circumstances where plaintiff had a right to rely thereon, with the intention that plaintiff rely thereon; plaintiff did in fact rely upon said misrepresentations, and has transferred certain mineral royalties to defendant from mineral deposits on Ogden Farms of the reasonable value of $1,000,000, and had given defendant an option to purchase one-half interest in the entire Ogden Farms for a payment of $140,000, all to plaintiff's general damages in the sum of $1,430,000. Plaintiff did not discover these misrepresentations were false and fraudulent until after[4] April, 1975.

"V.

"That defendant has acted wilfully and maliciously in complete disregard of the fiduciary relationship between the parties, and as a deterrent should be required to pay punitive damages of $500,000."

These allegations are more elaborate than those in the first case and assert different and additional charges of misrepresentation. There is obvious overlapping between the two complaints, however, in the matter of the asserted misrepresentations.[5]

---

[4] The word "after" was inserted upon motion of plaintiff to amend at the time of trial.

[5] We shall return to factors relevant to this overlapping.

It appears that trial in the second case commenced on December 1, 1976, at which time a jury was empaneled, opening statements were made, and plaintiff took the stand and testified upon direct examination until near the end of the day. Before proceeding further the trial judge called for legal argument on the issue of res judicata to commence the following morning. The parties agreed that the clerk's file from the first case would be received in evidence, and apparently no other evidence was received. The parties further agreed that in this second case the trial of the issue of res judicata was for the court. The trial judge then granted a motion for continuance of the jury trial to another time, set a briefing schedule, later found that defendant was entitled to prevail on his defense of res judicata, and entered judgment accordingly for defendant for costs and disbursements.

One thing that is immediately apparent is that neither the trial judge had, nor this court has, any basis upon which to determine what evidence was introduced upon trial of the first case, for there was no transcript of the proceedings upon the first case trial introduced on trial of the second case.[6] We are required, therefore, to determine from the trial court file in the first case what was litigated and could have been litigated.

This brings us to a rather curious set of circumstances. The complaint in the first case alleged that the parties "orally agreed" in December, 1971, to enter into a partnership or joint venture and reduced "this informal oral agreement into a written agreement on or about June 22, 1972 [.]" Resort to footnote 1, *supra,* will show that, as to claimed misrepresentations, plaintiff pleaded that they were made *to induce*

---

[6] In a colloquy between court and both counsel the parties made various representations as to what the judge in the first case had done and had not done with respect to the receiving of evidence, but the colloquy is not evidence in this second case. Of course, a party may be found to have made a judicial admission during any colloquy.

*plaintiff to enter into the oral agreement* of December, 1971. Comparing that complaint with the one in the second case we find that the second case complaint is concerned with alleged misrepresentations (paragraph III) "[c]ommencing in June, 1972" and continuing to the day before the filing of the second case. Despite this apparent segregation by time period of the alleged misrepresentations, as we noted above, there is an obvious overlapping with respect to claimed misrepresentations concerning defendant's net worth and the amount of money that would be available to defendant from his law practice for investment in the partnership business.

Because of our uncertainty as to plaintiff's contentions with respect to the timing of these representations and the legal effects which might flow from that timing we set the case for re-argument.[7] Prior to hearing re-argument we addressed several questions to counsel, including the following (also showing relevant parts of plaintiff's answers):

"(2) Were the representations alleged in paragraph III of plaintiff's amended complaint in #94099 [the second case] all made after the partnership came into existence?"

[Answer] "The representations in Para III in Case No. 94099 (the fraud action) were all made *after* the partnership was commenced in December, 1971, by an oral agreement." (Emphasis in original.)

"(3) Were any of the representations alleged in 90753 [the first case] made after the partnership came into existence?"

[Answer] "The representations in Case No. 90753, the suit in equity, were all made *after* the partnership came into existence. * * *" (Emphasis in original.)

This judicial concession by plaintiff establishes that despite the allegations of the first case complaint the

---

[7] We were, also, concerned with the interrelationship of the doctrine of *McKee v. Capitol Dairies,* 164 Or 1, 99 P2d 1013 (1940), upon the timing of the misrepresentations alleged to have been made in these two cases, respectively. We discuss that case later in the body of the opinion.

[195]

operative facts, other than "discovery" of defendant's alleged fraud, had all occurred after the partnership came into existence. We shall return to that point later.

In *Dean v. Exotic Veneers, Inc.,* 271 Or 188, 191-2, 531 P2d 266 (1975) we quoted with approval from *Gwynn v. Wilhelm,* 226 Or 606, 608, 360 P2d 312 (1961):

> "In applying the doctrine of *res judicata* it is necessary first to determine whether the second action is upon the same cause of action as the first or whether the two actions are upon different causes of action. If the second action is upon the same cause of action the judgment in the first action is conclusive as to all matters which were litigated or which might have been litigated in the first action. If the second action is upon a different cause of action, the judgment in the first action is conclusive only as to the matters essential to the judgment which were actually litigated and determined therein.* * *"

Defendant had the burden of proof upon his affirmative defense of res judicata, and he did not put in any evidence of what occurred upon trial of the first case. Upon this record, therefore, neither the trial court nor this court has any basis to find that any claims of misrepresentation were actually litigated other than those alleged in plaintiff's first case complaint. In other words, *there is no evidence* that the claims of misrepresentation in the second case *were litigated* in the first case. Indeed, the findings and decree in the first case support an inference that no issues of misrepresentation were actually litigated. From the findings and decree discussed above in the first case it appears that the matters actually litigated as essential to the decree ("judgment") were the formation of the partnership and its agreed upon termination and division of assets by the agreements of June 21 and July 18, 1974. Res judicata will not obtain on the ground that the matters *were* litigated.

If the second case, however, is upon the same cause of action as the first case, we must determine whether the trial judge in the second case could find upon the evidence that all matters which were the subject of the second case could have been litigated in the first case.[8] Before deciding whether the second case is on the same cause of action and, consequently, whether these matters *could have been* there litigated, we shall dispose of plaintiff's contention that he was prevented under case law from asserting these claims of fraud prior to settlement of partnership accounts.

■ Plaintiff has consistently contended in the trial court and upon appeal that under a rule stated and applied in *McKee v. Capitol Dairies,* 164 Or 1, 99 P2d 1013 (1940), he could not have litigated all matters in the first case because he could not file his common law action for damages for fraud until the partnership had terminated. In *McKee,* 164 Or at 5, it was said:

> " 'The rule is quite general that an action at law will not lie in favor of one or more partners or their representatives against one or more copartners or their representatives upon a demand growing out of a partnership transaction *until* there has been a settlement of account and a balance struck: 15 Pl. & Pr. 1005; *Wilson v. Wilson,* 26 Or.251 (38 Pac.185); *McDonald v. Holmes,* 22 Or.212 (29 Pac.735).' *Simpson v. Miller,* 51 Or.232, 235, 94 P.567; See also *Li Sai Cheuk v. Lee Lung,* 79 Or.563, 146 P.94, 156 P.254." (Emphasis added)

It is the use of the underscored "until" which misled plaintiff as to the possibility of including his claim of fraud with his suit in equity, which he conceived to be one to dissolve the partnership and to strike a balance. In *McKee* the court applied a general rule to the

[8] Since this is an action at law the trial judge's disposition of factual issues is entitled to the same consideration upon appeal as would that of a jury, and we cannot gainsay him unless we can affirmatively say there is no evidence to support his findings. *Hendrix v. McKee,* 281 Or 123, 575 P2d 134 (1978).

specific facts of that case.[9] There the personal representative of a deceased partner brought an action at law to recover for services and materials rendered by the decedent in carrying out the partnership business. There had been no prior accounting and no balance struck. The material quoted, *supra,* from *McKee* is quoted from *Simpson v. Miller,* 51 Or 232, 235, 94 P 567 (1908), but was not applied in *Simpson.* The language of *Simpson,* following that quoted in *McKee,* explains the general rule and will help in showing why the general rule quoted from *McKee* was not applicable in *Simpson* and is not applicable in the case at bar:

> "* * * The reason for the rule, it is said, is found in the inherent nature of the partnership relation, and consists in the fact that prior to the accounting and settlement of the partnership affairs, no cause of action exists between the partners founded solely upon partnership dealings: 15 Pl. & Pr. 1015; *McDonald v. Holmes,* 22 Or. 212 (29 Pac. 735). The rule has been announced and applied in a great variety of cases. Thus it has often been held that a partner cannot maintain an action at law to recover compensation for work and labor or services performed by him for the firm, or for money paid by him for the use of the firm, or contributed to the capital of the firm, or for goods sold to the firm, or for a share of the profits earned by the firm, or of the proceeds of partnership property. Nor will an action lie against a partner for money had and received by him for the use of the firm, or for a proportionate share thereof, or for money drawn out of the firm in excess of his share, or to recover the price of property sold to him by the firm: 15 Pl. & Pr. 1017-1019."

The rule was not applied in *Simpson* because the promise sued upon was not made in the course of

[9] There are cases before and after *McKee v. Capitol Dairies,* 164 Or 1, 99 P2d 1013 (1940), concerning application of the general rule. *See, e.g., Pac. Gen. Contrs. v. Slate Const. Co.,* 196 Or 608, 617, 251 P2d 454 (1952); *Li Sai Cheuk v. Lee Lung,* 79 Or 563, 571, 146 P 94, 156 P 254 (1916); *Wilson v. Wilson,* 26 Or 251, 257, 38 P 185 (1894); *McDonald v. Holmes,* 22 Or 212, 216-217, 29 P 735 (1892).

partnership dealings and did not arise out of partnership transactions, but was made between the parties as individuals.

It will be noted that *Simpson* relied upon 15 Encyclopedia of Pleading and Practice 1017-1019. An examination of that encyclopedia will show that the language from *Simpson* is substantially a direct quote from the encyclopedia at pages 1017-1019. The language quoted from *Simpson* in *McKee* is substantially a quote from page 1005 of the encyclopedia. *See* 15 Pl. & Pr. 1005. Unfortunately for plaintiff in the case at bar in considering the quoted language is the fact that the quotation ends too soon. The matter immediately following demonstrates why the quotation from *McKee* has no application to this case, even though it is a good statement of the general rule. The matter immediately following thus appears:

"* * * This rule is of general application and prevails in all cases with the exceptions hereinafter mentioned, *where the firm as a firm* is entitled to take the benefit of the transaction, or is subject to the liability sought to be enforced." (Emphasis added) 15 Pl. & Pr. 1005-1008.

Obviously, in the case at bar the firm of plaintiff and defendant is neither entitled to take the benefit of the transaction nor is subject to the liability sought to be enforced. Certainly plaintiff is not seeking enforcement of a partnership liability; certainly the partnership as a firm is not entitled to the benefit derived from any defrauding of plaintiff by defendant. To hold the partnership would be so entitled would result in the absurdity of saying that plaintiff and defendant were to divide the proceeds of defendant's fraud upon plaintiff.

The encyclopedia further discusses the general rule. It is stated:

"The reason most frequently assigned for the rule under consideration rests upon the principle that one cannot be both a plaintiff and a defendant in the same suit either singly or with others.

"Partnership rights and liabilities are joint, and in an action thereon all the partners must join or be joined as plaintiffs or defendants. Accordingly if an action at law could be maintained between partners upon a partnership matter, the partners sued as defendants would also be necessary parties plaintiff, which would be an anomaly never permitted at common law." (Footnotes omitted) 15 Pl. & Pr. 1011.

"\* \* \* \* \*

"The objection to the maintenance of this class of actions between partners lies deeper than any mere question of procedure or forms of action. The real reason for the rule is found in the inherent nature of the partnership relation and consists simply in the fact that prior to an accounting and settlement of the partnership affairs, no cause of action exists between the partners founded solely upon partnership dealings, *except an equitable action for an accounting and settlement of the affairs of the partnership.* (Emphasis added)

"*The Relation of Debtor and Creditor Does Not Exist* between partners or their representatives until the partnership affairs are wound up and a balance struck.

"*Until the Affairs of the Partnership Are Wound Up,* what one partner may owe the firm is not a debt due to a copartner; nor is the indebtedness of the firm to one of the members a debt from the other members to him." (Original emphasis; footnotes omitted) 15 Pl. & Pr. 1015-1016.

It is seen, therefore, that the rule of *McKee* will prevent the bringing of certain legal claims by partner against partner prior to settling of accounts and the striking of a balance between the partners. This does not mean, however, that in a suit to accomplish the striking of a balance a partner cannot assert the fraud of the other partner insofar as it is pertinent to striking that very balance and allocating to the respective individuals their proper respective interests in the partnership property. Moreover, if when the balance is struck and one partner is found to be entitled to a credit which cannot be satisfied out of the partnership

assets by reason of the other having wrongfully depleted those assets, the chancellor can enter such decree as will make the wrongdoer's personal assets subject to the claim of the defrauded partner.

We now consider whether the second case is upon the same cause of action as was the first. This requires us to describe what is meant by "cause of action" *in the context of this particular case.* We first turn to that context.

As we have already noted the complaint in the first case was a conglomerate of claims both legal and equitable, some of which arose out of transactions relating to partnership affairs and some of which did not, although the proceeding was entitled a suit to dissolve a partnership and for an accounting. No objections were made by defendant to this melange of legal and equitable claims. The case was tried and disposed of by a decision upholding an affirmative defense asserting that an agreement entered into by the parties two and one-half years after the formation of the partnership was a settlement of all of the parties' rights against the other of whatever nature. As set forth in footnote 3, *supra,* the trial judge found:

"* * * It is my general finding that the agreement of June 21, 1974, (Ex. 21) was intended to be and was legally effective as a full and complete compromise settlement agreement between the parties *of all prior dealings, agreements and obligations. This includes the partnership or joint venture and all included transactions and also collateral; dealings and obligations, including those arising by virtue of a client-attorney relationship. * * *.*" (Emphasis added)

No appeal was taken therefrom and thus no contention was made that the decision was broader than was justified by the pleadings or the evidence.

■ ■ For res judicata purposes a "claim" or "cause of action" does not mean the particular form or proceeding by which a certain kind of relief is sought but, rather, a group of facts which entitled plaintiff to relief. The adjustment of the rights of the parties

[201]

arising out of the partnership affairs is the basis of a single claim. Our discussion in *Dean v. Exotic Veneers, Inc.,* 271 Or 188, 192-94, 531 P2d 266 (1975), is relevant:

"The principal purposes of res judicata are prevention of harassment of defendants by successive legal proceedings as well as economy of judicial resources. Its scope is related to the limits upon the various forms of relief which may be requested in one proceeding and the limitations upon amendments to pleadings during trial. As permissible joinder of requests for various forms of relief and amendments during trial become broader and more liberal, the reasons behind res judicata dictate that parties to actions be required to make use of such liberal procedures and not be permitted to protract litigation through a multiplicity of suits or actions which can be disposed of in one proceeding. See Clark on Code Pleading 472-78 (2d ed 1947); also, *Jarvy v. Mowrey,* 235 Or 579, 583, 385 P2d 336 (1963). Therefore, with the advent of code pleading and the abandonment of rigid common law forms, the definition of 'cause of action' has tended to expand. As pointed out in Clark, *supra* at 127:

" 'At common law the number and extent of the grievances for which the plaintiff might seek redress in a single suit were arbitrarily limited by forms of action. In equity, principles of trial convenience alone applied. The codes adopted the equity rule in substance, but attempted to give it precision by the concept "cause of action," denoting a single occasion for judicial relief.'

"Having in mind the purposes to be served by the application of the doctrine of res judicata, we agree with Clark in the following:

" ' Various more or less conflicting views of the nature of a single cause of action are expressed by courts and authors. The most convenient one is to consider a cause of action as an aggregate of operative facts giving rise to a right or rights termed "right" or "rights of action" which will be enforced by the courts. The number and extent of operative facts included within a single cause of

[202]

action are to be determined *pragmatically,* mainly by considerations of practical trial convenience. There is no absolute or arbitrary test.' Clark on Code Pleading at 127. (emphasis added)

"* * * * *.

"If in the present case we apply Clark's concept of 'cause of action' for res judicata purposes, it becomes apparent that there is but a single occasion for judicial relief, even though there are alternative contentions concerning the circumstances under which they were rendered and thus alternative grounds or theories for recovery. To the extent that a given state of facts is susceptible to alternative interpretation and analysis, plaintiff must seek and exhaust all alternative grounds or theories for recovery in one action."

Of course, in the present situation, the first case was one in equity and, as Clark says, principles of trial convenience apply. Equity having secured cognizance for accounting purposes could have granted full relief despite the division of law and equity which then existed. Evidence of fraud could have been introduced and the equity court could have given adequate redress. The *issue is not* whether an action for deceit could have been joined with a suit for the dissolution of a partnership and an accounting, but whether plaintiff could have presented evidence of the fraud in the equity case and have received redress of his resultant grievances. He could have. At the very least, *any factual basis* for relief that could have been asserted by plaintiff in the first case should not be the basis for relief in this second case.

This second case is one in which it is claimed that after the partnership was entered into defendant by misrepresentation defrauded plaintiff of partnership property. Laying aside the amorphous character of the first case complaint and treating that proceeding as an ordinary partnership dissolution which its title purported it to be, fraud practiced by defendant during the partnership which resulted in his securing an interest

in partnership property was relevant to a decision concerning the distribution of the partnership assets and was a matter which the court in the first case could have properly considered. Having instituted a proceeding to which evidence of fraud between the parties was relevant, plaintiff could not fail to produce evidence which would have allowed the court either to restore the property to him or, if the property was not available, require defendant to account for its value and then, subsequently, request a different measure or form of relief and sustain it by such evidence.

In the division of the property and in its accounting, the equity court could have done anything a court of law could have done in an action of deceit except award punitive damages. Punitive damages are for the purpose of punishing a defendant and making an example of him for others. Plaintiff has no personal interest in punitive damages sufficient to outweigh the interest in avoiding repetitive litigation. Plaintiff brought a proceeding in which his claim *to be made whole,* because of defendant's alleged fraud, could have been fully considered. The interests to be weighed are those of the public in the allowance of punitive damages against the interest of the public in preventing costly, repetitious litigation as well as the interest of the defendant in being free from the harassment of successive legal proceedings. As between these interests, the interest in preventing repetitious litigation is the greater. Also see the American Law Institute's Tentative Draft No. 5 of March 10, 1978, Restatement (Second) of the Law of Judgments, § 61, Comment *c.* set forth, *infra.*

■    The trend of the law in the direction which we take in disposing of this case is evident. The legislature of this state has been steadily liberalizing the rules of joinder of causes of action and of suit. *See,* Or Laws 1975, ch 158, § 1; Or Laws 1977, ch 356, § 2 (codified ORS 16.221); Or Laws 1979, ch 284, § 18. Related thereto is the abolishment of the distinction between law and equity. *See,* Rule 2 ORCP (Oregon Rules of

Civil Procedure) and Or Laws 1979, ch 284, § 4(2). It is reasonable to conclude that the public policy of this state encourages the disposition in one proceeding of claims between parties litigant.

Not only is that true with respect to the statutory law of this state but of the common law generally. This is accomplished by a fresh approach to determining what is a "claim." We read the American Law Institute's Tentative Draft No. 5 of March 10, 1978, Restatement (Second) of the Law of Judgments, § 61, as being in accordance with our previous decision in *Dean* and reflecting the trend of the case law. The draft sets forth its impression of the law as follows:

> "Dimensions of 'Claim' for Purposes of Merger or Bar -- General Rule Concerning 'Splitting'
>
> "(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 47, 48), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
>
> "(2) What factual grouping constitutes a 'transaction', and what groupings constitute a 'series', are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."

Under Comment *a.* to the section, the following is found:

> "The present trend is to see [the] claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split.

"This definition of claim to engross the relevant transaction, as envisioned in this Topic, simplifies the application of the rules of merger and bar (see, for example, § 61.1, Comment *a*); it enhances the benefits deriving from those rules [see § _____] without causing undue hardship. Equating claim with transaction, however, is justified only when the parties have ample procedural means for fully developing the entire transaction in the one action going to the merits to which the plaintiff is ordinarily confined. * * *."

In addition, under Comment *b.,* the following is found:

"The expression 'transaction, or series of connected transactions', is not capable of a mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the cases. And underlying the standard is the need to strike a delicate balance between, on the one hand, the interests of the defendant and of the courts in bringing litigation to a close and, on the other, the interest of the plaintiff in the vindication of a just claim.

"It should be emphasized that the concept of a transaction is here used in the broad sense it has come to acquire in the interpretation of statutes and rules governing pleading and other aspects of civil procedure. Thus the overtones of voluntary interchange often associated with the term in normal speech *do not obtain.*

"In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of trial convenience makes it appropriate to ask *how far the witnesses or proof in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded.* But the opposite does not hold true: even when there is not a

substantial overlap, the second action may be precluded if it stems from the same transaction or series." (Emphasis added)

Also, under Comment *c.*:

"That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims. This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, *or would call for different measures of liability or different kinds of relief* * * *." (Emphasis added)

Again, under Comment *d.*:

"* * * When a defendant is accused of successive but nearly simultaneous acts, or acts which though occurring over a period of time were substantially of the same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same action. The events constitute but one transaction or a connected series * * *."

■ Plaintiff, in bringing his suit, put in issue all the dealings between the partners which affected the equitable distribution of the partnership property between them. By presenting evidence of the fraud in the first proceedings, he could have secured an adjustment of the property rights between the partners, taking into consideration any fraud which had occurred, and, as indicated by the above comment, the fact that different measures of liability or different kinds of relief might have been available, had a different sort of proceeding been instituted, does not keep the doctrine of res judicata from being applicable.

Whether plaintiff's allegations of misrepresentation in the second case were the same or different than those in the first case and whether there were allegations necessary to an action of deceit in the first case, is entirely irrelevant if plaintiff could have introduced evidence of the claimed fraud of the defendant in the first case and secured relief therefrom.

[207]

From the record could the trial judge find that the property of which plaintiff claims defendant defrauded him was partnership property? The written partnership agreement which was entered into by the parties provided that the property which plaintiff put into the partnership includes "all of Troutman's interest in Ogden Farms * * *." The first case put in issue the parties' interest in Ogden Farms. The complaint in the first case alleged:

"* * * However, at the present time plaintiffs believe and allege that the parties claim among other things the following:

"a. Defendant claims he and plaintiffs are tenants in common of the Ogden Farms property. Defendant is presently living upon said property, and claims he has the right to either ownership of 150 acres of the property, with plaintiffs to remove all incumbrances, or one acre free and clear, with 150 acres belonging to Willora Corporation.

"b. Defendant claims plaintiffs have the primary obligation on the Ogden Farms contract of sale, that defendant is only secondarily liable, and if he pays the obligations he is entitled to ownership of plaintiff's interest therein.

"c. Defendant claims plaintiffs are primarily liable for all future projects of Ogden Farms including the removal and sale of the sand, presently enjoined by this court.

"d. Plaintiffs claim that defendant has never performed any of the various agreements between them, especially the contracts of June, 1974, and July, 1974 [the settlement agreement] , and that because of a substantial breach and a violation of the fiduciary relationship between the parties, defendant should be completely removed from the title to Ogden Farms, should vacate his present possession of the premises, and account to plaintiffs for all the expenditures incurred by plaintiffs on behalf of the parties, including the $28,900 referred to hereinabove. However, defendant has orally repudiated said June, 1974, and July, 1974 agreements.

"e. The rights of Willora Corporation have expired, or in the alternative plaintiffs believe that its rights can be terminated by Ogden Farms.

"f. Plaintiffs claim that defendant has wilfully or persistently committed a breach of their various partnership agreements, or conducted himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership, within the meaning of ORS 68.540(d).

"g. Plaintiffs believe that under the provision of ORS 17.725, this court should on its own motion, *direct* a reference and *an accounting of the various business transactions and agreements between plaintiffs and defendant,* and that the court should appoint one or three referees *to examine all such transactions* and make an accounting to the court." (Emphasis added)

The settlement agreement between the parties which was upheld by the trial judge in the first case specifically provides what should happen to Ogden Farms. The complaint in the second case alleges that in reliance upon defendant's misrepresentations to plaintiff *during the partnership,* plaintiff transferred to defendant royalties "from mineral deposits on Ogden Farms" and gave defendant "an option to purchase one-half interest in the entire Ogden Farms" and suffered damages as a result.

Thus it is demonstrated that Ogden Farms was partnership property; that the first case requested an accounting of the parties' interests therein, and that damages were requested in the second case because of the transfer during the partnership of interests in Ogden Farms to defendant.

The transcript of plaintiff's testimony filed in this court on July 10, 1979, is further enlightening in determining what he was seeking to prove in the second case as compared to what he pleaded in the second case. Although he pleaded and submitted to this court his affirmance that the misrepresentations upon which he relied took place *after* the partnership

commenced, his testimony (concededly not completed) on the first day of this trial dealt with representations of the kind pleaded as occurring after June, 1972, but according to his testimony taking place in the fall of 1971. In the words of Tentative Draft No. 5 of § 61(2) quoted above, the facts with which both cases deal "are related in time, space, origin, or motivation" and "they form a convenient trial unit." Moreover, in the words of comment *b,* also above quoted, it certainly appears that "witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first" and that the overlap is substantial. In such case, says the comment, the second action should ordinarily be held precluded.

The only reason for permitting plaintiff to maintain this second case would be his asserted lack of actual and constructive knowledge of the fraud in time to give evidence of it at the trial of the first case. Keeping in mind that in this second case, an action at law tried on this issue without a jury, we are bound by the trial judge's finding in favor of the defendant unless we can affirmatively say there is no evidence to support that finding, we turn to the record which plaintiff designated upon this appeal. If that record permits finding that plaintiff knew, or in the exercise of reasonable diligence should have known, of the fraud we must affirm.

From the testimony of plaintiff to which we above alluded the trial judge could have found that at least part of the claimed misrepresentations commenced in the fall of 1971, a time prior to the very commencement of the partnership.

Plaintiff designated as part of the record on appeal a long colloquy which took place when plaintiff asserted the amendment of his complaint at the time of trial. (This followed plaintiff's leaving the stand on the first day of trial.) See footnotes 4 and 6, *supra.* A portion of that colloquy follows:

"THE COURT: But once you're in equity and

equity has jurisdiction, then it can give a complete remedy.

"[PLAINTIFF'S COUNSEL]: I understand that, but there was Mr. Troutman there -- The evidence will be that even up to that time [trial of the first case in July, 1975] he had no knowledge of that fraud.

"THE COURT: Your pleading says that he didn't have knowledge until April of 1975.

"[PLAINTIFF'S COUNSEL] : I wanted to add to that, your honor. I wanted to add 'after' April of '75.

"THE COURT: Well, I don't know whether it says 'after' or 'on' --

"[PLAINTIFF'S COUNSEL] : It just says April, '75, and I want to -- because that came as a surprise yesterday -- to add, just add one word by interlineation to meet the res judicata. The proof will be, the opening should that it was in September actually when there's another agreement here in September between these two people again, supposedly interpreting their rights and duties which made Mr. Troutman finally realize, 'My gosh, it's been a fraudulent scheme,' because of the assertions made by Mr. Erlandson at that time.

"THE COURT: Well, that's before or after the decree?

"[PLAINTIFF'S COUNSEL] : After the decree.

"THE COURT: Well, I don't know that he's hurt.
"* * * * *

"[PLAINTIFF'S COUNSEL] : Oh, there's just so many reasons, your Honor, why that was never presented and no attempt to present, because there was no knowledge of it at that time, at least that there was not until about September when we had another agreement and Erlandson made other assertions that what he considered his rights were; what he wanted out of that farm. Mr. Troutman finally determined that he'd been defrauded. That's since September, well after the decree.
"* * * * *

"THE COURT: * * * You say that it was April, 1975, that your client became aware of the fraudulent conduct of the defendant. Then you've just wanted to say you want to amend that to 'after' April,

[211]

1975. But it appears to me from what I know about this case that the conduct was known to him all the time and that it's simply April of '75 or after April of '75 that he realized that this conduct really amounted to fraud.

"[PLAINTIFF'S COUNSEL] : Right, by September. That should be 'after April.' April is when the first answer was filed in the partnership case with many allegations about a breach of contract as partners.

"THE COURT: But isn't it fair to say that he knew the things that were done but it just dawned on him sometime in '75 that it was done fraudulently?

"[PLAINTIFF'S COUNSEL] : Right, by September he knew promises that weren't kept and realized that, 'my gosh, this man is keeping [a] $1,000,000 asset and never paid a dime for it. It's been fraud.' So I do want the complaint -- I do want to formally move on the record that the word 'after' be entered by interlineation.

"* * * * *"

From this colloquy, which plaintiff has specifically asked us to note, it is fair to conclude that plaintiff's position *now* is that it was not only "after April, 1975" but, also, after the decree dated Spetember 19, 1975, which was "filed" September 22, 1975, that he discovered the fraud.

■ It is to be remembered, however, that plaintiff went to trial in this case upon a complaint in which he took the position that he learned of the fraud in April, 1975. During the colloquy, the judge kept saying, in effect, that he did not see why plaintiff could not have presented his evidence of fraud to the equity court in the first case and been made whole in that proceeding. It was only with disaster staring him in the face, that plaintiff shifted ground to allege that he did not learn of the fraud until "after" April, 1975. The allegation as amended, however, is not a pleading of lack of knowledge at the time of trial of the first case sufficient to avoid the defense of res judicata. Under the allegation pleaded it is just as probable that plaintiff learned of

the fraud before the trial of the first case (in May or June, 1975) as it is that he learned of it thereafter. After decision pleadings are construed strongly against the pleader who has lost. "Stated another way, pleadings are liberally construed after verdict and judgment in order to sustain the judgment." 61 Am Jur 2d 502, Pleadings, § 62 (1972).

■■ We have not overlooked the issue of who had the burden of pleading and proof on the plea of res judicata. Normally the party who asserts that plea would have the burden of pleading and proving facts necessary to establish the defense. Since the second case complaint alleges that at least part of the misrepresentations occurred during the existence of the partnership and, therefore, prior to the trial of the first case, ordinarily the party asserting that the fraud could have been tried in the first case would have the burden of showing that it had been, or should have been, discovered prior to that trial. In this case, however, it appears that plaintiff anticipated the plea and sought to avoid it by assuming the burden of pleading and proving his want of discovery in time to litigate the issue in the first case trial. This appears from the fact that in this second case in the complaint filed in October, 1975, and in the amended complaint filed in December, 1975, plaintiff alleged April, 1975, as the date of discovery. The equivocal amendment was not even made before trial commenced, but only when it became apparent that the original allegation would probably lead to defeat. Having assumed the burden of pleading and proof on this element, plaintiff cannot now shift it to defendant.

We conclude that in the peculiar circumstances of the relations and relationships between these parties, the second case is on the same cause of action as the first; therefore, the issues in the second case "might have been litigated in the first" case. *Dean v. Exotic Veneers, Inc.,* and *Gwynn v. Wilhelm,* both *supra.*

We hold that upon this state of pleading and upon

the record, we are not permitted to overturn the "verdict" of the trial judge in favor of defendant. See footnote 8, *supra.*

Affirmed.